UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NAKIA LEA MICHAEL,  )<br>  )<br>   Plaintiff,  )<br>  )<br>  vs.  )<br>  )<br>KILOLO KIJAKAZI, *Acting Commissioner*  )<br>*of the Social Security Administration*,  )<br>  )<br>   Defendant.  )  | Case No. 4:20-cv-00893-MTS |

## MEMORANDUM AND ORDER

This matter is before the Court for review of a partially adverse ruling by Defendant, the Acting Commissioner[1] of the Social Security Administration. For the reasons explained herein, the Court will remand the case for further proceedings. *See* 42 U.S.C. § 405(g).

**I.   Background**

   a.   *Procedural History*

On February 28, 2011, Plaintiff filed applications for Social Security Disability benefits under Title II of the Social Security Act (the "Act") and for Supplemental Security Income benefits under Title XVI of the Act alleging an onset of disability date of March 12, 2010. After the Commissioner denied Plaintiff's claim on initial consideration, Plaintiff requested a hearing before an Administrative Law Judge (ALJ), who held a hearing on her claim on October 18, 2012. In a decision dated December 27, 2012, the ALJ found Plaintiff was not disabled. Plaintiff then requested review of the ALJ's decision by the Appeals Council, which denied review on June 20, 2015.

---

[1] Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted as the proper Defendant in this action.

Plaintiff timely filed a civil action in this Court challenging the Commissioner's decision. In a Memorandum and Order dated September 30, 2015, a District Judge of this Court reversed the decision of the Commissioner and remanded the claim for further administrative proceedings because "the Appeals Council erred in failing to consider new and material evidence." *Michael v. Colvin*, No. 4:14-cv-01445-JAR, 2015 WL 5768633, at *5 (E.D. Mo. Sept. 30, 2015). In February 2016, the Appeals Council remanded the claim to an ALJ for a new hearing and decision. Plaintiff received a second hearing before a new ALJ on June 30, 2016, and that ALJ found Plaintiff was not disabled. Plaintiff timely appealed that ALJ's decision to the Appeals Council, and in February 2018, the Appeals Council remanded the claims to that ALJ.

Plaintiff then had a third hearing on July 10, 2018 before the ALJ—the same ALJ who found her not disabled the second time. A supplemental hearing before that same ALJ was held on March 28, 2019. Finally, in a decision dated April 22, 2019, that ALJ found Plaintiff disabled from March 12, 2010 through November 6, 2014. The ALJ concluded that Plaintiff's disability ended on November 7, 2014. Plaintiff filed exceptions to the decision, but the Appeals Council declined to assume jurisdiction and denied her request for review on May 6, 2020. The April 22, 2019 decision of the ALJ therefore is the Commissioner's final decision.

## II.     Determining Disability Under the Act

### a.     *Determining Disability in the First Instance*

To be eligible for benefits under the Act, a claimant must prove she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552 (8th Cir. 1992). The Act defines a disabled person as someone who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." § 1382c(a)(3)(B).

The Commissioner engages in a five-step process to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920; *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). "If [the] claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590–91 (8th Cir. 2004)). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"—if so, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"—if so, then the Commissioner will proceed to the next step; if not, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner determines whether the claimant's severe impairment or combination of impairments meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings")—if so, then the claimant is disabled; if

not, then the Commissioner will proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(e).

Prior to Step Four, the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is "the most [the] claimant can still do despite [his] physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011); *see also* 20 C.F.R. § 404.1520(e). At Step Four, the Commissioner determines whether the claimant is able to perform past relevant work—if so, then the claimant is not disabled; if not then, the Commissioner will proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. At Step Five, the Commissioner considers whether there are alternative work opportunities in the national economy in light of the claimant's RFC, age, education, and work experience—if so, then the claimant is not disabled; if not, then the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

The claimant bears the burden of proof through Step Four of the analysis. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). However, if the claimant meets this burden and demonstrates he cannot perform his past work, then the burden of proof shifts to the Commissioner to establish at Step Five "that the claimant has the [RFC] to perform a significant number of other jobs in the national economy that are consistent with [his] impairments and vocational factors such as age, education, and work experience." *Phillips*, 671 F.3d at 702.

  b.  *Determining the Continuation of Disability*

"When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where [s]he is able to perform substantial gainful activity." *Delph v. Astrue*, 538 F.3d 940, 945

(8th Cir. 2008) (citing 42 U.S.C. § 423(f)(1)). The regulations provide that determining whether a claimant's disability has ceased involves up to eight steps. *Id.*; *see also* 20 C.F.R. § 404.1594 (eight steps under Title II claim for individuals insured under the Act); *id.* at § 416.994 (seven steps under Title XVI claim for SSI).

The steps to determine whether a claimant's disability has ceased are: (1) whether the claimant is engaging in substantial gainful activity;[2] (2) whether the claimant has an impairment or combination thereof that meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) whether there has been medical improvement as defined as any decrease in the medical severity of the impairment(s) based on improvement in the symptoms, signs and/or laboratory findings; (4) whether the medical improvement is related to the ability to work, which results in an increase in the claimant's ability to perform basic work activities; (5) whether an exception to medical improvement applies; (6) whether all of the claimant's current impairments in combination are severe; (7) if the impairment(s) is severe, whether the claimant has the residual functional capacity based on all current impairments to perform past relevant work; and (8) if unable to do past work, whether the claimant can do other work given the residual functional capacity assessment, age, education, and past work experience. 20 C.F.R. §§ 404.1594(f)(1)–(8); *Burke v. Saul*, No. 1:20-cv-0009-SRW, 2020 WL 7041807, at *3 (E.D. Mo. Dec. 1, 2020).

### III. The ALJ's Decision

The ALJ's applied the five-step process outlined above. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 12, 2010, the date Plaintiff asserted her disability began. (Tr. 467). At Step Two, the ALJ found that from March 12, 2010

---

[2] This first step, whether the claimant is engaging in substantial gainful activity, is not a step for determining continuing disability under Title XVI. The remaining seven steps of Title II are identical to Title XVI, other than their numbering. 20 C.F.R. § 416.994(b)(5)(i)-(vii).

through November 6, 2014 Plaintiff had the following sever impairments: major depressive disorder, anxiety, post-traumatic stress disorder, moderate persistent asthma, and obesity. (Tr. 467). At Step Three, the ALJ found that from March 12, 2010 through November 6, 2014 the severity of Plaintiff's impairments met the criteria of section 12.04A and B of 20 C.F.R. § 404, Subpart P, Appendix 1 (listing for depressive, bipolar and related disorders). (*Id.*). Accordingly, Plaintiff was disabled.

The ALJ next followed the standard eight[3] step determinations that Plaintiff's disability ceased. (Tr. 474). The ALJ determined Plaintiff had not developed any new impairment or impairments since November 7, 2014 and that beginning November 7, 2014, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.*). Medical improvement, the ALJ concluded, occurred as of November 7, 2014, and the medical improvement was related to Plaintiff's ability to work because Plaintiff no longer had an impairment, or combination of impairments that met or medically equaled the severity of an impairment listing. (Tr. 475).

The ALJ, therefore, next determined Plaintiff's RFC based on her current impairments. The ALJ found that Plaintiff could perform "medium work" as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c) except that she must avoid concentrated exposure to pulmonary irritants, such as dust, odors, gases, fumes, and poorly ventilated areas. She could perform simple, routine, repetitive tasks in a low stress job defined as only occasional simple work-related decisions and few, if any, changes in work setting. The work must not require fast-paced production quotas, and her job responsibilities must not involve public interaction, have only

---

[3] The ALJ concluded that Plaintiff was not engaging in substantial gainful activity, meeting the first element for disability under Title II, which is not an element under Title XVI.

occasional contact with coworkers with no tandem tasks, and only occasional contact with supervisors. The ALJ concluded that Plaintiff still was unable to perform past relevant work, so the ALJ proceeded to the final step to decide whether other work existed that Plaintiff could perform given her RFC and considering her age, education, and past work experience. The ALJ determined that such jobs did exist in significant numbers in the national economy that Plaintiff could perform. Accordingly, the ALJ determined Plaintiff was not disabled.

### IV. Standard For Judicial Review

This Court must affirm the Commissioner's decision if the decision applies the correct legal standards and is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Wright*, 789 F.3d at 852 (quoting *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008)); *see also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (quoting *Consolidated Edison*, 305 U.S. at 229)).

To determine whether substantial evidence supports the Commissioner's decision, the Court must review the record and "consider evidence that both supports and detracts from the decision." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). "If substantial evidence

supports the [Commissioner's] decision, [the Court] will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." *Id.*

V.     **Discussion**

At issue in this case is whether the decision applied the correct legal standards and whether substantial evidence supports that Plaintiff's mental impairments ceased being disabling on November 7, 2014. *See, e.g.*, Doc. [13] at 3 n.5 (noting Plaintiff does not dispute the physical limitations found by the ALJ); Doc. [18-1] at 2 n.2 (noting Plaintiff only contests the unfavorable portion of the ALJ's decision); Doc. [18-2] at 1 n.1. In determining that Plaintiff's disability ended, Plaintiff asserts that the ALJ erred in two ways. First, the ALJ, Plaintiff's asserts, failed to properly weigh the medical opinion evidence and failed to properly determine Plaintiff's mental RFC since November 7, 2014. Second, the ALJ, Plaintiff asserts, failed to properly evaluate Plaintiff's subjective statements regarding her impairments since November 7, 2014. Defendant argues that substantial evidence supports the ALJ's evaluation of the opinion evidence of record and of Plaintiff's subjective complaints in formulating the RFC finding for the period beginning on November 7, 2014. Defendant accordingly asks the Court to affirm the Acting Commissioner's decision.

Since Plaintiff filed for disability insurance benefits *before* March 2017, the so-called "treating physician rule" applies. 20 C.F.R. §§ 404.1520c(a), 404.1527; *Wymer v. Saul*, No. 4:19-cv-2616-MTS, 2021 WL 1889870, at *6 n.3 (E.D. Mo. May 11, 2021). This rule means that a "treating physician's opinion should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Nowling v. Colvin*, 813 F.3d 1110, 1122 (8th Cir.

2016) (internal quotations and citations omitted).  An ALJ must give "good reasons" for discounting a treating physician's opinion. *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020); 20 C.F.R. § 404.1527(c)(2).

If an ALJ decides not to give a treating physician's opinion controlling weight, then the ALJ uses several factors to evaluate the opinion, including the consistency of the opinion with the record as a whole, the length of the treatment relationship and frequency of examinations, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, and the level of specialization of the source.  20 C.F.R. § 404.1527(c)(2)–(6); *Lucas*, 960 F.3d at 1068.  SSA guidance provided that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewer . . . the reasons [for the decision]."  *Lucas*, 960 F.3d at 1068 (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Here, Plaintiff's treating physician was Michael Patterson, D.O., who had treated Plaintiff for many years even prior to her disability, (Tr. 550), and who specifically had treated Plaintiff for anxiety and depression since at least April 2011.  (Tr. 470).  Throughout the record are numerous notes and documents from and by Dr. Patterson regarding his treatment of Plaintiff over the last decade, which include multiple Medical Source Statements. *See, e.g.*, (Tr. 1191, 1172).  Prior to Dr. Patterson serving as Plaintiff's primary provider of mental health care, Plaintiff had seen two psychiatrists, but, in a most unfortunate turn of events, both of Plaintiff's psychiatrists died.  (Tr. 549).

Relevant to the time period at issue here—between November 7, 2014 and April 22, 2019—Dr. Patterson completed two Impairment Questionnaires regarding Plaintiff's mental

impairments, one in February 2016 and another in June 2018. On the February 2016 Impairment Questionnaire, Dr. Patterson noted that Plaintiff had depressed mood, persistent generalized anxiety, a flat affect, feelings of guilt, hostility or irritability, anhedonia, decreased energy, suicidal ideation, difficulty thinking or concentrating, easy distractibility, poor immediate memory, intrusive recollections of a traumatic experience, and sleep disturbance. (Tr. 476, 1110–1114). He wrote that Plaintiff experienced episodes of decompensation or deterioration in work-like settings that caused her to withdraw or experience exacerbation of her symptoms. (*Id.*). He noted multiple marked or moderate to marked limitations she experienced and noted that her impairments or the treatment thereof would cause her to miss work more than three times a month. (*Id.*).

The ALJ gave "little evidentiary weight" to Dr. Patterson's February 2016 findings that Plaintiff had marked limitations in her ability to complete a normal workday or workweek, perform at a consistent pace, and Dr. Patterson's opinion that Plaintiff would be absent from work more than three times a month. (Tr. 477). For his reasoning, the ALJ noted the "lack of abnormal clinical findings" and "the testimony and statements by the claimant" that she took her kids to school daily, occasionally went out to eat with her parents, and went camping twice a year. (Tr. 477).

The ALJ did not cite any portions of the record to demonstrate the lack of abnormal clinical findings, and there certainly are numerous places in the record where Dr. Patterson notes abnormal clinical findings. *See, e.g.*, (Tr. 1128) (noting Plaintiff was "sleeping all the time," is "[p]aranoid," and "presents with major depression"); (Tr. 1131) (describing Plaintiff's palpitations, shortness of breath, and hyperventilation); (Tr. 1137) (noting Plaintiff's crying spells, guilt, fatigue, and anxious mood); (Tr. 1208–10) (noting that Plaintiff could not remember

some of the last two weeks and noting Plaintiff's flat affect).  The Court does not find that the ALJ provided reasoning "sufficiently specific to make [it] clear to any subsequent reviewers" why he gave Dr. Patterson's opinion little weight.  *Lucas*, 960 F.3d at 1068 (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).  The "blanket statement" mentioning a lack of abnormal clinical findings does not suffice here when the Court has found multiple examples of abnormal clinical findings in the record.  *Lucas*, 960 F.3d at 1068 (noting that the ALJ "need not be exhaustive" but "'blanket statement[s]' will not do" for explanations on weight given to treating physician's opinion).

As for Dr. Patterson's June 2018 findings, the ALJ gave "great evidentiary weight" to Dr. Patterson's findings "that [we]re consistent with the records as of November 7, 2014."[4]  (Tr. 478).  While an ALJ may discount opinions contradicted by other evidence in the record, an ALJ is not entitled simply "to pick and choose from a medical opinion . . . only those parts that are favorable to a finding of non-disability."  *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004) (quoting *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004)).  The June 2018 findings discussed the "frequent worsening" of Plaintiff's depression, and that Plaintiff "experienced episodes of decompensation or deterioration in a work setting." (Tr. 478); *accord* (Tr. 1193).  Like Dr. Patterson's conclusion in the February 2016 evaluation, he continued to believe Plaintiff likely would miss work more than three times a month due to

---

[4] It is not clear to the Court what, exactly, the ALJ meant when he purported to give great evidentiary weight to Dr. Patterson's June 2018 findings that were consistent with the records from forty-three months prior.  It is well-established, though, that mental impairments can wax and wane.  *See, e.g.*, *Goolsby v. Berryhill*, No. 4:17-cv-2508-NAB, 2019 WL 1326988, at *4 (E.D. Mo. Mar. 25, 2019); *Wellman v. Berryhill*, No. 4:16-cv-04159-VLD, 2017 WL 5990116, at *28 (D.S.D. Nov. 9, 2017), *report and recommendation adopted*, No. 4:16-cv-04159-LLP, 2017 WL 5992311 (D.S.D. Dec. 1, 2017).  The ALJ's requirement to provide "good reasons" for the weight afforded to a treating physician's evaluation "must be articulated with acknowledgment of the nature of the disorder at issue." *Nowling v. Colvin*, 813 F.3d 1110, 1123 (8th Cir. 2016).  It is unclear to the Court how Dr. Patterson's evaluation showing his conclusion that Plaintiff had anxiety and depression and experienced episodes of decompensation or deterioration in a work setting can be weighed to support a finding that Plaintiff was *not* disabled forty-three months prior, especially considering that mental impairments can wax and wane.

her impairments or treatment thereof. (Tr. 478).

Besides the issue of the evidentiary weight he gave to Dr. Patterson's findings "that [we]re consistent with the records as of November 7, 2014," (Tr. 478), the ALJ also mischaracterized it. Regarding this Mental Impairment Questionnaire, the ALJ wrote that Joseph M. Carver, Ph.D., an impartial medical expert, testified that "at Exhibit 31F,[5] [Plaintiff's] physician, Dr. Patterson, noted that [Plaintiff's] condition had stabilized[,] and she had only moderate limitations in functioning." (Tr. 469). This statement, however, is doubly inaccurate. First, the Court has looked at Exhibit 31F and does not see that Dr. Patterson noted any such stabilization. Second, while the ALJ did not cite the specific testimony, the Court has not seen in Dr. Carver's testimony where he testified that Dr. Patterson noted any such stabilization. Rather, Dr. Carver testified only that he believed Dr. Patterson's opinions "suggest" that Plaintiff's depression and anxiety "had stabilized," which "probably" reduced some limitations "to the moderate range." (Tr. 626). Thus, not only did the ALJ give Dr. Patterson's opinion lesser weight, he also softened the opinion.

The Court's conclusion that the ALJ did not properly discount and subsequently explain the weight he gave to Dr. Patterson's opinions is compounded by other evidence in the record that buttresses Dr. Patterson's opinions. Dr. Carver, the impartial medical expert, testified at Plaintiff's supplemental hearing that Dr. Patterson's treatment notes were "[i]n general" consistent with the Medical Source Statement that Dr. Patterson provided. (Tr. 631). In particular, Dr. Carver testified that Dr. Patterson's findings regarding Plaintiff's marked functional impairments related to performing activities within a schedule, being punctual, and completing a workday without interruption from psychological symptoms were "legit." (Tr.

---

[5] Exhibit 31F is Dr. Patterson's Psychiatric/Psychological Impairment Questionnaire from June 19, 2018.

631). Thomas J. Spencer, Psy.D., a consultative psychologist whose evaluation the ALJ gave "great evidentiary weight," (Tr. 477–78), noted that Plaintiff demonstrated "moderate to marked impairment in her ability to interact socially and adapt to the environment," (Tr. 1186). In sum, this is not a case where other experts' opinions greatly diverged from the treating physician's opinions.

As for Plaintiff camping a couple times a year with her family, occasionally dining out with her parents, and taking her children to school, the Court "do[es] not understand the purported inconsistenc[y]" with Dr. Patterson's conclusion that Plaintiff had a marked limitation in her ability to complete a normal workweek. *Lucas*, 960 F.3d at 1068. Dr. Patterson's opinion was that Plaintiff would be absent from work more than three times per month. That Plaintiff took her children to school, went camping a couple times a year with her immediate family, and occasionally ate dinner out with her parents is not, on its face, inconsistent with a finding that Plaintiff's anxiety and depression would cause her to miss work more than three times per month. In order to be found not disabled, Plaintiff "must have the ability to perform the requisite [work] day in and day out" and the "ability to sustain these activities over a period of time." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005). Thus, the Court does not see how the most basic acts of living one's life and interacting with one's own close family show inconsistency with Dr. Patterson's specific findings, and "[a]bsent some explanation for finding an inconsistency where none appears to exist," the Court will not fill in the gaps for the ALJ, *Lucas*, 960 F.3d at 1068. *Cf. Pate-Fires*, 564 F.3d at 947 (noting the ability to perform "minimal daily activities" is "consistent with chronic mental disability"); *Reed*, 399 F.3d at 923 (explaining that a plaintiff's testimony about her anxiety, panic attacks, and discomfort around strangers was not inconsistent with plaintiff still having the ability to perform routine and simple daily living

activities, including going to a grocery store with a family member).

The ALJ also seems to make much of the fact that Plaintiff had not been treated by a psychiatric specialist since 2014. *See, e.g.*, (Tr. 477) ("However, [Plaintiff] reported that she last saw a mental health professional in 2013."); (Tr. 479) (stating medical treatment notes "do not document findings, rendered in the course of treatment, by a treating psychiatrist or psychologist, of any significant limitations of function"); (*id.*) (noting Plaintiff's "fail[ure] to seek treatment" in reference to Plaintiff's lack of "regular psychiatric treatment").  True, the opinions and findings of a specialist certainly can be entitled to more weight. *See, e.g.*, Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); 20 C.F.R. § 404.1527(c)(5) (explaining the Social Security Administration "generally give[s] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty"). But the way Plaintiff's primary care physician became Plaintiff's sole provider of mental health care is far from ordinary. Plaintiff had the misfortune of having two of her treating psychiatrists die while she was a patient of them, (Tr. 549), grim occurrences that would be difficult for anyone regardless of their mental health.  Her psychiatrist's death in August of 2014 contextualizes Plaintiff's lack of psychiatric care around the time the ALJ concluded her disability ceased.

Plaintiff testified at length about the anxiety she felt over starting over with a *third* psychiatrist after the two psychiatrists that treated her each died. (Tr. 549) (Plaintiff testifying she "lost it" when she went into the office of her second psychiatrist after the first died); (Tr. 550) (Plaintiff testifying that "reliv[ing]" her "whole life" of "mental illness" "over and over again" to new providers "hurts" and was "so hard"). She instead continued treatment with her

longtime primary care physician, Dr. Patterson. (Tr. 550). Even if the ALJ properly would have determined and provided good reasons for not giving Dr. Patterson's opinions controlling weight and subsequently used his lack of specialty in determining the weight given to Dr. Patterson's opinions, 20 C.F.R. § 404.1527(c)(5), the ALJ should not have used Plaintiff's failure to seek further specialty treatment to discount Plaintiff's subjective complaints and symptoms without addressing whether Plaintiff's mental impairments themselves caused her failure to seek specialty treatment. *See Pate-Fires*, 564 F.3d at 945 (explaining how "recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment" (internal quotations omitted)). In other words, her failure to seek treatment from a third psychiatrist, given her impairments and the circumstances, cannot be used to discount her symptoms if her mental impairments caused her failure to seek further specialty treatment.[6]

## CONCLUSION

The Court acknowledges that it is not its role to re-weigh the evidence or determine what weight to provide to it; that is the role of the ALJ. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). But, here, the Court concludes that the ALJ did not provide sufficient "good reasons" to discount Dr. Patterson's opinions, which the Social Security Administration's regulations required, 20 C.F.R. § 404.1527(c)(2)–(6), and erred when evaluating Plaintiff's subjective complaints and symptoms. The Court cannot say that the ALJ's error in weighing Plaintiff's

---

[6] The fact that Plaintiff "ha[d] not sought regular psychiatric treatment" was not the only factor the ALJ discussed where Plaintiff's mental impairments may themselves have caused the noted failures. (Tr. 479). The ALJ also, without citing to the record, wrote that Plaintiff did not always "comply with prescribed treatment." (*Id.*). To the extent that statement is accurate, it was erroneous for the ALJ to discount Plaintiff's symptoms based on an alleged lack of compliance with prescribed treatment without an explanation or evidence in the record that demonstrates Plaintiff's reasons, other than her mental impairments themselves, for failing to comply with a prescribed course of treatment. *Pate-Fires*, 564 F.3d at 945. While it is for the ALJ, and not this Court, to determine Plaintiff's "real motivation," *Hutsell v. Sullivan*, 892 F.2d 747, 751 n.2 (8th Cir. 1989), that determination must consider whether noncompliance is a result of her mental impairments, or the record must show reasons other than her mental impairments for those types of failures. *Earnheart v. Astrue*, 484 F. App'x 73, 74–75 (8th Cir. 2012); *id.* at 75 (Bye, J., dissenting) (quoting *Pate-Fires*, 564 F.3d at 945).

treating physician's opinions was harmless because the Court cannot determine whether the ALJ would have reached the same decision denying benefits even if he had followed the proper procedure for considering and explaining the value of Dr. Patterson's opinion. *Lucus v. Saul*, 960 F.3d 1066, 1070 (8th Cir. 2020).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this matter is **REMANDED** for further proceedings pursuant to 42 U.S.C. § 405(g).

A separate Judgment shall accompany this Memorandum and Order.

Dated this 31st day of March, 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE